Richard G. Grant
Tex. Bar No. 08302650
CM LAW, LLP
National Litigation Support Center
13101 Preston Road, Suite 110-1510
Dallas, Texas 75240
Telephone: 214-210-2929
Email: rgrant@cm.law

ATTORNEYS FOR
DEBTORS IN POSSESSION

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ER OF TEXAS, LLC; | § | Case No. 26-40606 |
| ER OF TEXAS COLLEYVILLE, LLC; | § | Case No. 26-40608 |
| ER OF TEXAS FRISCO, LLC; | § | Case No. 26-40609 |
| ER OF TEXAS HIGHLAND VILLAGE, LLC; | § | Case No. 26-40611 |
| ER OF TEXAS HILLCREST LLC; | § | Case No. 26-40612 |
| ER OF TEXAS HURST, LLC; | § | Case No. 26-40613 |
| ER OF TEXAS LITTLE ELM, LLC; | § | Case No. 26-40614 |
| ER OF TEXAS TEXOMA, LLC; | § | Case No. 26-40615 |
| ER OF TEXAS UPTOWN, LLC; | § | Case No. 26-40616 |
| MEDOPS STAFFING LLC; AND | § | Case No. 26-40617 |
| PERT, PLLC, [1] | § | Case No. 26-40618 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | (Joint Administration Requested) |

### DECLARATION OF RONNIE WALRAVEN
### IN SUPPORT OF DEBTORS' FIRST DAY MOTIONS

I, Ronnie Walraven, hereby declare under penalty of perjury as follows:

### I.      INTRODUCTION

1.      I am the Manager of ER of Texas, LLC, the lead debtor in these chapter 11 cases.

On behalf of ER of Texas, LLC, and its affiliated debtors and debtors in possession (collectively,

---

[1] The debtors and debtors in possession are ER of Texas, LLC (EIN: 85-1751319); ER of Texas Colleyville, LLC (EIN: 87-1585575); ER of Texas Frisco, LLC (EIN: 85-1820777); ER of Texas Highland Village, LLC (EIN: 85-1794491); ER of Texas Hillcrest LLC (EIN: 87-1552062); ER of Texas Hurst, LLC (EIN: 87-1558323); ER of Texas Little Elm, LLC (EIN: 85-1778208); ER of Texas Texoma, LLC (EIN: 87-1558137); ER of Texas Uptown, LLC (EIN: 87-1651640); MedOps Staffing, LLC (EIN: 83-4637945); and PERT, PLLC (EIN: 85-3330746). The mailing address of the debtors is 2800 Little Elm Parkway, Little Elm, Texas 75068.

the "Debtors"), I submit this declaration. I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

2.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and prior restructuring initiatives, and/or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

3.    I submit this declaration (this "Declaration") in support of the Debtors' First Day Motions, which include:

    a)    Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion");

    b)    Debtors' Motion for Entry of an Order Designating these Chapter 11 Cases as Complex and Approving Case Management and Noticing Procedures (the "Complex Case Motion");

    c)    Debtors' Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Granting Adequate Protection (the "Cash Collateral Motion");

    d)    Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (i) Continue Use of Existing Bank Accounts and Business Forms; and (ii) Open New Debtor in Possession Accounts (the "Cash Management Motion");

    e)    Debtors' Motion for an Order Authorizing the Payment of Prepetition Employee Wages, Benefits, Business Expenses and Related Relief (the "Wages Motion");

    f)    Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Prepetition Claims of Critical Vendors (the "Critical Vendor Motion");

    g)    Debtors' Motion for Authority to Pay Prepetition Independent-Contractor Physician Obligations (the "Physician Payment Motion");

h)      Debtors' Motion for Extension of Time to File Schedules of Assets and Liabilities, Schedule of Executory Contracts, and Statement of Financial Affairs (the "Schedule Deadline Motion"); and

i)      Debtors' Emergency Motion for Entry of Interim and Final Orders Prohibiting Utilities from Altering, Refusing, or Discontinuing Service (the "Utilities Motion").

## II. BACKGROUND

### A.      THE DEBTORS' CHAPTER 11 CASES

4.      On February 10, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B. THE DEBTORS' BUSINESS OPERATIONS

5.      The Debtors operate a network of freestanding emergency medical care facilities ("FEMCs") across Texas. ER of Texas Emergency Room is an alliance of healthcare professionals dedicated to uncompromising service to the people of Texas and surrounding communities.

6.      The Debtors include ER of Texas, LLC, which serves as Manager, and, numerous affiliated operating entities, including but not limited to ER of Texas Hurst LLC, ER of Texas Hillcrest LLC, ER of Texas Colleyville LLC, ER of Texas Texoma LLC, ER of Texas Uptown LLC, ER of Texas Highland Village, LLC, ER of Texas Little Elm, LLC, and ER of Texas Frisco, LLC. Additionally, MedOps Staffing LLC employs and provides administrative personnel to the operating entities, and PERT, PLLC serves as the Debtors' physician staffing vehicle, engaging licensed physicians as independent contractors and supplying 24/7 physician

coverage to the Debtors' emergency facilities. Attached hereto as **Exhibit A** is a diagram correctly reflecting the organizational structure of the Debtor entities.

7.      The Debtors provide 24-hour emergency healthcare services at their freestanding emergency medical care facilities. The Debtors deliver quality patient-centered emergency healthcare services in a safe, efficient, equitable, and fiduciary responsible manner. Each facility provides emergency care, including medical screening examinations, stabilizing treatment, diagnostic laboratory services, ultrasound services, and radiology services.

8.      Collectively, the Debtors employ approximately 147 W-2 employees through MedOps Staffing LLC across their locations, including nursing, radiology, and patient registration staff; however, only 127 are being paid this pay period. The Debtors also engage independent-contractor physicians through PERT, PLLC pursuant to written Physician Staffing Agreements dated as of November 15, 2021.

### C.      CORPORATE HEADQUARTERS AND LOCATIONS

9.      The Debtors' corporate headquarters is located at 2800 Little Elm Parkway, Little Elm, TX 75068. The Debtors operate freestanding emergency room facilities at multiple locations across the Dallas-Fort Worth metropolitan area, including:

   a)      Colleyville (5000 Hwy 121, Colleyville, TX 76034);

   b)      CLOSED: Frisco (16300 Hwy 121, Frisco, TX 75035); and

   c)      Highland Village (3160 Justin Rd, Highland Village, TX 75077);

   d)      Hillcrest/Dallas (6215 Hillcrest Ave, Dallas, TX 75205);

   e)      Hurst (824 Airport Fwy, Hurst, TX 76054);

   f)      Little Elm (2800 Little Elm Pkwy, Little Elm, TX 75068);

   g)      Texoma/Sherman (115 W Travis St, Sherman, TX 75092); and

h)      CLOSED: Uptown/Dallas (3607 Oak Lawn Ave, Suite 100, Dallas, TX 75219).

## D.      CORPORATE STRUCTURE

10.      ER of Texas, LLC was formed as a Texas limited liability company on April 28, 2020. The company is managed by managers. The parent ER of Texas, LLC's operating agreement reflects member ownership by Ron Walraven (33.33%), Michele Brownfield (33.33%), and Phillip Michael Hawk, Jr. (33.33%).

11.      Each site-level entity is manager-managed by ER of Texas, LLC, with execution in financing documents by myself as Manager, evidencing centralized managerial control over operating affiliates.

12.      Certain of the Debtor entities were formed on July 7, 2021, including ER of Texas Hurst LLC, ER of Texas Colleyville LLC, and ER of Texas Texoma LLC. ER of Texas Little Elm, LLC was formed on July 2, 2020. ER of Texas Funding, LLC was formed on July 30, 2021 for the purpose of ownership and operations and funding of freestanding emergency room centers in Texas.

13.      The governing bodies of each Debtor entity adopted resolutions authorizing the filing of voluntary Chapter 11 bankruptcy petitions, employment of legal and financial professionals, and related actions to facilitate reorganization and address financial liabilities.

## III. CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS

## A.      SENIOR SECURED INDEBTEDNESS

14.      The Debtors have a complex capital structure with significant secured and unsecured debt. Multiple lenders hold secured claims, as evidenced by numerous UCC-1 financing statements filed against the Debtors and their assets.

15.     The Debtors' primary senior secured lender is Encore Bank, N.A. (the "Senior

Lender"), which is party to a Loan Agreement dated November 2, 2022, as amended by a Loan

Modification Agreement dated October 2024. The obligations to the Senior Lender (the "Senior

Indebtedness") are evidenced by, among other documents, Amended and Restated Promissory

Notes in the original principal amounts of $2,250,000 and $2,000,000, and are allegedly secured

by a blanket lien on substantially all of the Debtors' assets. As of the Petition Date, the Debtors

have outstanding debt to Encore Bank in the approximate amount of $400,000 allegedly secured

by a blanket senior lien.

### B.      SUBORDINATED INDEBTEDNESS

16.     The Debtors also obtained financing from Newtek Bank in the form of a term loan

in the approximate amount of $15,000,000, secured by a senior position on real estate and

operations of HWP ERTX Investor, LLC, the owner of the real estate at Little Elm and Highland

Village and a subordinated position on the personal property assets of certain of the Debtors.

Newtek has contractually subordinated its security interest to Encore's security interests pursuant

to the Newtek Commercial Security Agreement, dated as of March 25, 2025.

### C.      OTHER SECURED CLAIMS

17.     Beyond the Encore Debt and Newtek Secured Claims, numerous other creditors

have asserted secured claims against the Debtors and their assets. These claims, arising from

various financing and merchant cash advance agreements, are evidenced by a significant number

of UCC-1 financing statements filed with the Texas Secretary of State, encumbering specific

assets, accounts receivable, and/or all assets of individual Debtor entities.

18.     Many of these agreements are styled as "Merchant Agreements" or "Future

Receivables Sale Agreements" with parties such as MCA Funding Group, Forever Funding LLC,

and CapitalDomain LLC. These arrangements are typically allegedly secured by UCC-1
financing statements granting a security interest in all or substantially all of the assets of the
specific Debtor entity, with a particular focus on all present and future accounts receivable,
chattel paper, and general intangibles.

19.     As of September 30, 2025, the Debtors have approximately $11,000,000 in
outstanding MCA obligations.

20.     As of the Petition Date, the Debtors' total secured and unsecured debt exceeds
$17,000,000.

### D.     THE DEBTORS' ASSETS

21.     The Debtors' primary assets consist of accounts receivable, equipment, inventory,
real property, and cash, much of which is encumbered by liens. Many of the Debtors' properties
serve as collateral for the Debtors' secured obligations.

### IV.     EVENTS LEADING TO CHAPTER 11

22.     The Debtors' financial distress is a result of rapid, debt-fueled expansion,
operational challenges, and significant litigation costs. While the business grew in scale, it
became over-leveraged, and revenues were insufficient to service the substantial debt load
incurred to fund facility acquisitions and operations.

23.     The Debtors' attempts to secure additional out-of-court financing to address their
liquidity constraints were unsuccessful. Consequently, the Debtors determined that a chapter 11
filing was necessary to obtain the protection of the automatic stay, secure debtor-in-possession
financing, and pursue a value-maximizing path for all stakeholders, whether through a sale or a
plan of reorganization.

## V. FIRST DAY MOTIONS

### A.    JOINT ADMINISTRATION MOTION

24.    The Debtors have filed the Joint Administration Motion pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Local Rule 1015-1, requesting the entry of an order directing the joint administration of the Debtors' chapter 11 cases and the consolidation thereof for only procedural purposes. Joint administration will permit the Clerk to use a single docket for all of the cases and to combine notices to creditors of the Debtors, thereby avoiding the expense and administrative inconvenience of maintaining separate dockets, files, and notices.

25.    The Debtors consist of ER of Texas, LLC and its affiliated entities, which are "affiliates" within the meaning of section 101(2) of the Bankruptcy Code. The Debtors intend to prosecute these cases on a coordinated basis because their operations are integrated, their creditor constituencies overlap, and joint administration will avoid unnecessary cost and delay. Joint administration is solely procedural and will not affect the substantive rights of creditors or result in consolidation of the Debtors' estates.

26.    I believe that joint administration of these cases will promote judicial economy and reduce administrative costs by permitting the Clerk to maintain a single docket, by consolidating notices to creditors and parties in interest, and by minimizing duplicative pleadings.

### B.    CASH COLLATERAL MOTION

27.    As described above, the Debtors' primary secured lender is Encore Bank, which holds a blanket lien on substantially all of the Debtors' assets, including cash, accounts receivable, and other collateral (collectively, the "Cash Collateral"). The Debtors' cash, including

cash proceeds of accounts receivable arising from services rendered prior to the Petition Date,

constitutes "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code.

28.     The Debtors require the ability to use Cash Collateral to fund their day-to-day

operations, including payroll, vendor payments, and other ordinary course expenses necessary to

continue operating their freestanding emergency medical care facilities. Without the ability to

use Cash Collateral, the Debtors will be unable to fund their operations, pay their employees,

purchase supplies and medications, or otherwise continue providing emergency medical services

to patients.

29.     Access to the Cash Collateral is essential to the Debtors' ability to continue

operating their emergency room facilities, preserve the going-concern value of their businesses,

and maximize value for all stakeholders. Without access to the Cash Collateral, the Debtors

would be unable to pay employees, purchase medical supplies and pharmaceuticals, maintain

insurance, pay utilities, and meet other operational obligations. The immediate and irreparable

harm that would result from a cessation of the Debtors' operations would destroy the value of the

Debtors' estates and prejudice the interests of all creditors and parties in interest.

30.     The Debtors' emergency room facilities provide critical healthcare services to

patients in their communities. Disruption of these services would have severe consequences for

the health and welfare of patients who depend on the Debtors' facilities for emergency medical

care.

31.     In exchange for use of Cash Collateral, the Debtors propose to provide the Senior

Lender with adequate protection of its interest in the Cash Collateral, including replacement liens

on postpetition assets of the same type as the prepetition collateral, superpriority administrative

expense claims to the extent of any diminution in the value of the Senior Lender's collateral, and

other customary protections.

32.     The Debtors have prepared a thirteen (13) week cash flow budget which sets forth the Debtors' projected cash receipts and disbursements for the initial period following the Petition Date. The Budget reflects the Debtors' reasonable and good-faith estimate of the cash necessary to operate their businesses during this period. The Debtors' 13-week cash flow budget reflects projected weekly incoming cash of approximately $625,000, or approximately $89,286 per day, with projected weekly net operating income of approximately $155,165.

33.     I believe that the relief requested in the Cash Collateral Motion is in the best interest of the Debtors' estates, their creditors, and other parties in interest. The proposed adequate protection package is fair and reasonable and will protect the Senior Lender's interests while allowing the Debtors to continue operating their businesses as going concerns.

## C.     CASH MANAGEMENT MOTION

34.     The Debtors utilize a cash management system (the "Cash Management System") to collect, transfer, and disburse funds generated by their operations and to record such transactions. The Debtors' existing cash management system is comparable to the centralized cash management systems typically used by similarly sized corporate enterprises and is essential for the efficient operation of the Debtors' business.

35.     The Debtors' receipts are derived primarily from third-party payor remittances, including payments from commercial insurers and government healthcare programs. The Debtors receive payments from payors including, without limitation, UnitedHealthcare, Blue Cross Blue Shield of Texas, Cigna, Aetna, UMR, and various other insurance carriers and administrators. These remittances are deposited into the Debtors' bank accounts through electronic funds transfers, lockbox receipts, and other payment mechanisms.

36.     The Debtors maintain their primary bank accounts at JPMorgan Chase Bank, N.A. The bank accounts include operating accounts, revenue accounts, and money market accounts used by the various Debtor entities to receive funds and make disbursements. In addition, the Debtors utilize a lockbox account for centralized receipt of high-volume insurance remittances.

37.     Disbursements from the Debtors' bank accounts are used to fund the Debtors' ongoing operations, including payroll, physician compensation, rent, utilities, medical supplies, insurance premiums, taxes, and other ordinary course expenses necessary for the continued operation of the Debtors' emergency medical facilities.

38.     In the ordinary course of business, the Debtors engage in certain intercompany transactions to facilitate cash management across the enterprise. These transactions include transfers of funds between bank accounts to fund site-level operations, allocation of shared expenses among Debtor entities, centralization of receipts at the parent level followed by downstream funding to operating subsidiaries, and settlement of intercompany payables and receivables arising from ordinary course operations.

39.     Any disruption of the Debtors' cash management system would be extremely harmful to the Debtors' ongoing business operations and would impair the Debtors' ability to successfully administer their estates. I believe that the relief requested in the Cash Management Motion is necessary to enable the Debtors to continue to operate their businesses with minimal disruption while these cases are pending.

## D.     WAGES MOTION

40.     The Debtors employ approximately 147 W-2 employees through MedOps Staffing LLC (the "Employees") who perform essential functions related to the Debtors' emergency medical services, including nursing, radiology, and patient registration; however,

only 127 are being paid this pay period. All Employees are paid on a bi-weekly basis. These

Employees are critical to the Debtors' ability to continue providing emergency medical services

and generating revenue during these Chapter 11 Cases.

41.     The Debtors operate 24/7 standalone emergency rooms providing emergency

medical services to patients in the Dallas-Fort Worth metropolitan area. The Employees perform

essential healthcare functions at multiple locations including the Colleyville, Frisco, Highland

Village, Hillcrest, Hurst, Little Elm, Texoma, and Uptown areas. The Debtors are cash flow

positive.

42.     In the ordinary course of business, the Debtors incur and pay various obligations

to or for the benefit of their employees, including wages, salaries, reimbursable expenses, and

payroll-related taxes and deductions. The Debtors also provide benefits to employees, including

health insurance, and make payments to third parties in connection therewith.

43.     Failure to pay prepetition employee obligations could result in immediate and

irreparable harm to employee morale and, in turn, the Debtors' ability to operate their medical

facilities effectively. Many of the Debtors' employees depend on receiving timely payment of

their wages and would suffer severe personal hardship if payment were withheld. The potential

departure of valuable employees would significantly impair the Debtors' ability to continue

operations and maintain the quality of patient care.

44.     I believe the relief requested in the Wages Motion is in the best interest of the

Debtors' estates and is necessary to ensure the continued operation of the Debtors' businesses.

### E.     PHYSICIAN PAYMENT MOTION

45.     PERT, PLLC is the Debtors' physician staffing vehicle. It engages licensed

physicians as independent contractors (the "Contractor Physicians") and supplies 24/7 physician

coverage to the Debtors' emergency facilities pursuant to written Physician Staffing Agreements

dated as of November 15, 2021. Under the Physician Staffing Agreements, PERT, PLLC has the

exclusive right and duty for oversight and management of physician staffing and is responsible

for hiring, credentialing, scheduling, and compensating the Contractor Physicians.

46.     Pursuant to the Physician Staffing Agreements, Contractor Physicians are

compensated at a base hourly rate of $175 per hour for non-holiday shifts, with increased rates of

$195 to $205 per hour based on patient census milestones, and $255 per hour for shifts worked

on designated holidays (July 4, Thanksgiving Day, Christmas Eve, Christmas Day, New Year's

Eve, and New Year's Day). Compensation is calculated on an hourly basis, tracked in the

Debtors' scheduling and payroll systems, and remitted via ACH transfer or check. Historically,

the Debtors have paid Contractor Physicians on a current basis—typically daily, prior to or

promptly following each shift worked—and have endeavored to remain current on all physician

compensation obligations.

47.     As of the Petition Date, the Debtors estimate that the aggregate amount of current

Physician Contractor Obligations outstanding for the week immediately preceding is

approximately $151,286, representing amounts owed to physicians working across six active

facilities: Colleyville, Highland Village, Hillcrest, Hurst, Little Elm, and Texoma. This amount

represents physician compensation that accrued during the period immediately preceding the

Petition Date when the Debtors' bank accounts were frozen by one of the Debtors' merchant cash

advance lenders, which prevented the Debtors from making payments in the ordinary course.

48.     The Contractor Physicians are essential to the Debtors' continued operations.

Under applicable Texas law and regulatory requirements, each of the Debtors' freestanding

emergency medical care facilities must have a licensed physician on site at all times in order to

operate as an emergency clinic. If a Contractor Physician is not present at a facility, that facility

must immediately cease operations and close its doors to patients. Moreover, any interruption in continuous physician coverage may result in the decertification of that location as a licensed freestanding emergency medical care facility under state law, which would cause potentially irreparable harm to the Debtors' business and the communities they serve.

49.     If the Debtors are not authorized to pay prepetition Physician Contractor Obligations, the Debtors risk losing critical physician coverage, which would force the closure of one or more facilities, potentially trigger decertification, and severely impair the Debtors' ability to operate and generate revenue for the benefit of the estate and its creditors.

50.     I believe the relief requested in the Physician Payment Motion is in the best interests of the estate and is necessary to preserve the Debtors' operations and patient care.

## F.    CRITICAL VENDOR MOTION

51.     The Debtors, with the assistance of their management team and advisors, conducted a comprehensive review of their vendor relationships to identify those vendors providing goods and services so vital that even a brief disruption would threaten patient care, licensure, regulatory compliance, and public safety. Through this process, the Debtors identified seven Critical Vendors with aggregate prepetition balances totaling $513,455.

52.     The Critical Vendors include:

   a)     **EPowerDoc** – The Debtors' electronic medical records ("EMR") platform provider, responsible for documentation, imaging integration, and recordkeeping essential to patient care and regulatory compliance. Prepetition balance: $165,606. Transitioning to an alternative EMR provider would require sixty to ninety days and would cause operational downtime incompatible with state requirements that emergency rooms remain open.

   b)     **McKesson** – The Debtors' primary supplier of narcotic drugs through a Class F pharmacy arrangement. Prepetition balance: $110,000. Re-registration and DEA registration transfers to an alternative provider would require approximately ninety days, during which time the Debtors would be unable to provide essential patient care requiring controlled substances.

c)   **Med Partners** – The Debtors' supplier of essential medical supplies, including laboratory quality-control panels and non-narcotic drugs. Prepetition balance: $100,026. No local substitute suppliers have been identified that could provide comparable products on the necessary timeline.

d)   **PWR Technology** – The Debtors' provider of internet, telephony, VPN, and HIPAA-compliant network security services. Prepetition balance: $69,798. Replacement would require thirty to forty-five days of downtime and would adversely impact multiple other vendor relationships that depend on the Debtors' network infrastructure.

e)   **Integrated Ultrasound** – The Debtors' provider of ultrasound services, which are required under Texas state licensing requirements for freestanding emergency rooms. Prepetition balance: $59,625. No replacement vendors are available locally, and the services are a licensure requirement.

f)   **Clinic RX Partners** – The Debtors' pharmacist-of-record and Class pharmacy oversight provider. Prepetition balance: $7,200. Changes to the pharmacist-of-record require state board filings and would delay regulatory compliance.

g)   **Air Supply** – The Debtors' oxygen supply provider. Prepetition balance: $1,200. Oxygen supply is required for emergency room operations and regulatory compliance with freestanding emergency department standards.

53.   Based on vendor communications and operational assessments, these Critical Vendors will not continue delivering goods and services on commercially reasonable terms absent payment of prepetition amounts. Transitioning to alternative providers would require between thirty and ninety days, and in several cases no feasible local alternative exists, making any transition incompatible with uninterrupted emergency room operations and the Debtors' state-law obligations.

54.   To place the requested amounts in proper context, the total Critical Vendor prepetition exposure of $513,455 represents less than six days of projected cash receipts. The Critical Vendor amounts are modest relative to overall cash flow and represent essential expenditures that directly support patient care and regulatory compliance.

55.   The relief requested is particularly appropriate in the context of a health care debtor. Any interruption in the supply of essential goods and services—including EMR systems,

pharmaceuticals, medical supplies, network infrastructure, and oxygen—would directly and immediately jeopardize patient care and could result in loss of licensure.

56.    I believe the relief requested in the Critical Vendor Motion is in the best interests of the Debtors, their estates, and their creditors.

## G.    UTILITIES MOTION

57.    The Debtors rely on uninterrupted utility services, including electricity, natural gas, water and sewer, telephone and internet, solid waste removal, and site security monitoring, to provide emergency medical care, maintain patient safety, preserve accreditation and licensure, and maximize estate value.

58.    The Debtors receive utility services from providers including TXU Energy Retail Company LLC (electric), CoServ Electric, Atmos Energy Corporation (natural gas), various municipalities for water and sewer services, ATT and Frontier Communications for telecommunications, Spectrum (Charter Communications) for internet, Community Waste Disposal and Republic Services for solid waste, and Alert 360 for security monitoring.

59.    Uninterrupted utility service is essential to patient safety, facility accreditation and licensure, and the preservation of estate value. The Debtors operate freestanding emergency rooms where loss of electricity, gas, water, or communications could endanger patients and staff and result in facility closure.

60.    The Debtors propose to provide adequate assurance of postpetition utility payments through continued and timely payment of undisputed postpetition invoices in the ordinary course of business as they come due, and a cash deposit for each Utility Provider equal to fifty percent (50%) of the Debtors' estimated average monthly cost for that Utility Provider

based on the 12-month prepetition average for all applicable accounts and locations served by

that provider.

61.     I believe the relief requested in the Utilities Motion is necessary to ensure the

Debtors' continued access to essential utility services during these chapter 11 cases.

### H.     SCHEDULE DEADLINE MOTION

62.     Pursuant to Bankruptcy Rule 1007(c), a debtor must file schedules of assets and

liabilities, a schedule of executory contracts and unexpired leases, and a statement of financial

affairs within fourteen (14) days after the petition date, unless the court extends the time for

cause.

63.     The Debtors request an extension of thirty (30) days from the Petition Date,

through and including March 12, 2026, to file the Schedules and Statements. This extension is

necessary given the number of affiliated Debtors, the complexity of the Debtors' capital

structure, and the volume of information that must be gathered and compiled. The Debtors

include multiple operating entities with relationships with numerous vendors, payors, landlords,

and other counterparties.

64.     I believe the requested extension is reasonable under the circumstances and will

not prejudice any party in interest.

### I.     COMPLEX CASE MOTION

65.     These cases involve multiple affiliated Debtors operating a network of

freestanding emergency medical facilities and related healthcare operations across the DFW

Metroplex. As of the Petition Date, the Debtors maintained relationships with numerous vendors,

payors, landlords, and other counterparties, and employed staff across multiple locations.

66.      Given the number of affiliated Debtors, the scope of their business operations and creditor relationships, and the anticipated volume of motions and contested matters, the Debtors submit that these cases are appropriate for designation as complex chapter 11 cases and that implementation of case management and noticing procedures will benefit all parties in interest.

67.      I believe the relief requested in the Complex Case Motion will facilitate the efficient administration of these chapter 11 cases.

**VI. CONCLUSION**

68.      The Debtors require the relief requested in each of the First Day Motions to operate their businesses effectively and maximize value for all stakeholders. Without the ability to use Cash Collateral, pay employees and physicians, maintain utility services, and pay critical vendors, the Debtors' emergency room operations would cease, causing immediate and irreparable harm to patients, employees, and the communities the Debtors serve.

69.      I believe that the relief requested in the First Day Motions is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 10, 2026

/s/      Ron Walraven
RONNIE WALRAVEN Manager of
ER OF TEXAS, LLC, on behalf of the
Debtors

Dated: February 10, 2026                  Respectfully Submitted,

                                          CM LAW, LLP


                                          By:  ___/s/ Richard Grant_____
                                               Richard G. Grant
                                               Tex. Bar No. 08302650

                                          National Litigation Support Center
                                          13101 Preston Road, Suite 110-1510
                                          Dallas, Texas 75240
                                          Telephone: 214-210-2929
                                          Email: rgrant@cm.law

                                          ATTORNEYS FOR
                                          DEBTORS IN POSSESSION


## <u>CERTIFICATE OF SERVICE</u>

A unified certificate of service of first day matters is filed contemporaneously herewith.

                                          /s/ Richard G. Grant_____
                                          Richard G. Grant

**EXHIBIT A**
**ORGANIZATIONAL CHART**

